GASKILL and others *v.* BENTON and others.

VON UTASSY and others *v.* GALVIN and others.

*(Circuit Court, E. D. Pennsylvania.   July 1, 1881.)*

1. FRAUD—JOINT JUDGMENT—SECRET PREFERENCE OF ONE OF THE PLAINTIFFS.

A number of creditors made a loan to an insolvent firm to enable it to carry on its business, taking as security a joint judgment, with an understanding that the debtors should give no other judgments.   Two of these creditors secretly took a judgment note from the firm for the amount of their original claims, not including their proportion of the loan.   Upon the failure of the firm these two creditors, in violation of certain promises made with their knowledge by the debtors and after inducing delay in the issuing of execution on the original judgment, entered up their judgment note, issued execution, and swept away the entire personal property of the debtors.   *Held*, that this was a fraud upon the other parties to the original judgment, and that in the distribution of the proceeds of the debtor's property the execution thus obtained should be postponed to the execution upon that judgment.

2. PRINCIPAL AND AGENT—FRAUD OF AGENT—HUSBAND—ATTORNEY.

The two preferred creditors were represented by the same attorney as the debtors, and one of them was the wife of one of the debtors.   The delay in issuing execution upon the original judgment was obtained, not by the two creditors in person, but by a promise made by the debtors and by the attorney of the two creditors that no other judgment should be entered.   *Held*, that the two creditors could not take advantage of such delay.

3. BANKRUPTCY—PROCURATION—WHAT DOES NOT AMOUNT TO.

Debtors agreed to give a creditor notice when danger threatened, in order that he might obtain the first execution.   Afterwards they induced him, by misrepresentation, to delay proceeding, and procured an execution to be issued by another creditor more than sufficient to exhaust their property.   They then gave notice of this execution to the first creditor, who thereupon also issued execution.   *Held*, that this notice by the debtors was not a procuration of the second execution.

Exceptions to Report of Master.

This was a bill in equity by assignees in bankruptcy to set aside, on the ground of procuration, two executions, both levied on the debtor's property prior to the filing of the petition in bankruptcy.   A cross-bill was filed by the plaintiffs in the second execution, claiming to set aside the first execution on special equitable grounds outside of the bankrupt act.   The case was referred to a master, (Edwin T. Chase,) who reported substantially the following facts:

The firm of A. Benton & Bro., composed of Albert and Charles Benton, were lumber dealers in Philadelphia.   In June, 1876, they became financially embarrassed.   In order to carry on their business, they made application to some of their largest creditors for a loan of money, representing that they were not able to meet their obligations, but that if they could obtain such a loan they "could bridge over their embarrassments."   Honorable Charles P.

Waller, of Honesdale, Wayne county, Pennsylvania, a personal friend of the debtors, and Mrs. Elizabeth J. Benton, wife of the said Albert Benton, were the two creditors to whom they were indebted in the largest amounts. When Benton & Bro. applied to these two creditors to contribute with the others the latter agreed so to do; but, as the Bentons already owed Charles P. Waller about $11,000, and Mrs. Benton about $10,000, the latter demanded some security for this pre-existing indebtedness, which the debtors agreed to give.

As a result of the application to their creditors for a loan, a written agreement was drawn up on June 21, 1876, between the firm of A. Benton & Bro. and seven of their creditors, viz.: A. W. Von Utassy, John A. J. Sheets, Otto Lachenmeyer, Chandler P. Wainwright, William A. Levering, and Mrs. E. J. Benton, all of Philadelphia, and the said Charles P. Waller, of Honesdale. This agreement provided for a joint loan of $11,000 by this syndicate of creditors to the firm of A. Benton & Bro., secured by a judgment bond for $22,-000, conditioned for the repayment of the loan in one year, to be executed by A. Benton & Bro. to A. W. Von Utassy and John A. J. Sheets, as trustees for the whole syndicate. The agreement also expressly provided that it should not be binding until a statement of the real estate of A. Benton & Bro. should be furnished, and it should appear that such real estate was sufficient security for the loan. This agreement was executed by all the parties excepting William A. Levering, who declined to join. On June 28, 1876, a supplemental agreement was drawn up, in which the name of Willis L. Bryant, a partner of Chandler P. Wainwright, was substituted for William A. Levering, and it was also thereby provided that the judgment bond should be made payable in 10 days, instead of one year, (as provided in the first agreement,) but that execution should not issue within one year unless default should be made in the payment of the notes of A. Benton & Bro. (which, to a large amount, were then outstanding in the hands of the syndicate and other creditors) for 10 days after maturity.

Provision was also made for the *pro rata* distribution among the syndicate of partial payments on account of the bond. In all other respects the terms of the original agreement remained unchanged. This supplemental agreement was duly executed by all the parties, and on the same day a judgment bond, executed by the individual members of the firm of A. Benton & Bro., in accordance with the agreement, was entered of record, and became a lien on their real estate. The name of Charles P. Waller was signed to the agreement by J. M. Moyer, Esq., as his attorney in fact, under the following circumstances: J. M. Moyer was the attorney and general counsel of A. Benton & Bro., and was also a personal friend of Charles P. Waller. From his residence in Honesdale the latter sent to Mr. Moyer a letter of attorney to join in the syndicate upon his behalf, "upon satisfactory security, statement," etc., which letter of attorney referred to a letter of instructions bearing even date. Upon this authority Mr. Moyer executed the agreements. Two days after the execution of the supplemental agreement, A. Benton & Bro. drew up a paper releasing the trustees named in the agreement from the examination of the real estate. This they took to all the creditors named in the agreement except C. P. Waller, and obtained the signatures of said creditors thereto by representing that they were in pressing need of the money; that the statement of

their real estate would take some time to prepare, but that they would furnish it as soon as completed. This paper was also signed by J. M. Moyer as attorney in fact for C. P. Waller, but, it appears, without the actual knowledge of the latter, and without any direct authority from him. Subsequently, at various times, A. Benton & Bro. received, on account of the syndicate loan, from C. P. Waller $2,000; from A. W. Von Utassy $2,000; from John A. J. Sheets $2,000; and from Otto Lachenmeyer $1,000. Whether they received the remaining $4,000 from C. P. Wainwright, W. L. Bryant, and Mrs. E. J. Benton, was a matter of dispute, the complainants alleging that no money was received from these parties. The master found that they received $2,000 from Mrs. Benton, but nothing from Wainwright and Bryant.

At different times, after the execution of the syndicate agreement, A. Benton & Bro. told the syndicate trustees that they would not allow any one to press them, and that if any one did so, to judgment, they would promptly notify the syndicate. Neither Judge Waller, J. M. Moyer, nor Mrs. Benton was present on any of these occasions.

On the fifteenth of July, 1876, in accordance with their previous arrangement and agreement, A. Benton & Bro. executed a judgment note for $20,000 in favor of said C. P. Waller and Mrs. E. J. Benton, payable one day after date. This note, from the time it was given, was allowed to remain in the possession of said J. M. Moyer, who was instructed by C. P. Waller to hold the note until further orders; the latter, at the time, suggesting that he "didn't want to do anything that would interfere with the financial success of the Bentons, as might be occasioned by either entering the judgment or placing it in any other hands at the time." It was admitted that at least the sum of $20,000 was due by A. Benton & Bro. to these parties when this note was given.

At various times, after the entering of the syndicate judgment, the trustees therein named demanded from A. Benton & Bro. the statement of the real estate provided for by the syndicate agreement, but A. Benton & Bro. avoided furnishing or neglected to furnish such statement. On September 4, 1876, however, they gave to the syndicate trustees, in part payment of the loan, an order on their attorney, J. M. Moyer, Esq., for a mortgage of $1,500, which had been left in his hands by them for collection. The trustees presented the order to Mr. Moyer, who said it was all right; that he was negotiating for a sale of the mortgage; that he expected to get the proceeds in a few days, and would hand the amount over to them. The trustees asked him to advise them when he obtained the money, and he promised to do so. Subsequently the trustees made repeated calls upon him for the money, but were put off by him from time to time, and neither the mortgage nor its proceeds were ever handed over to the trustees.

On Thursday, January 25, 1877, at the request of the syndicate trustees, Charles Benton and J. M. Moyer met them at the office of their counsel, A. M. Burton, Esq. Neither Judge Waller nor Mrs. Benton was present. At this meeting the trustees demanded the statement of the real estate, and the surrender of the $1,500 mortgage, or its proceeds. Mr. Moyer promised that the statement should be furnished in a few days, and, with regard to the mortgage, stated that, as C. P. Waller was interested in the proceeds, he did

not wish to hand it over without authority from the latter, and desired time to write to him.

The trustees also inquired as to some judgments that had been recently entered against A. Benton & Bro., and were informed that there only remained one of small amount, for which the money would be forthcoming. There was some talk with reference to an execution on the syndicate judgment unless the matters were satisfactorily arranged. The meeting adjourned, according to the testimony of some of the creditors present, with the understanding that nothing should be done for 48 hours, and, according to the testimony of others, with the understanding that nothing was to be done " until the statement was furnished, which was to be on the following Monday or Tuesday." On the same day, after the meeting had adjourned, Charles Benton went to his brother Albert's house, and there met his brother and his brother's wife, Mrs. Elizabeth J. Benton. After some conversation between them, Charles Benton went immediately to the office of J. M. Moyer, and had a conversation with him. Mr. Moyer immediately placed the judgment note of $20,000, in favor of C. P. Waller and Mrs. E. J. Benton, in the hands of another attorney in the same building, (J. R. Sprague, Esq.,) directing him to issue the execution, which was accordingly done, and on the same day it was placed in the hands of the sheriff. In the evening of the same day, and after the execution had been issued, J. M. Moyer called upon Mrs. E. J. Benton, and, at his suggestion, she wrote a letter to J. R. Sprague, directing him to issue the execution.

The next morning (Friday, January 26, 1877) J. M. Moyer telegraphed to C. P. Waller to instruct B. F. Fisher, Esq., to issue execution against Benton immediately. On the same day C. P. Waller telegraphed to B. F. Fisher, Esq., to issue execution against the Bentons. Mr. Fisher, finding the execution already issued, entered his appearance for C. P. Waller, and notified the sheriff that he represented him in the execution. On the next day, (Saturday,) about 1 o'clock P. M., Charles Benton saw Chandler P. Wainwright, one of the syndicate creditors, and volunteered the information that execution had been issued on the $20,000 judgment. Mr. Wainwright, on the same afternoon, communicated this information to one of the syndicate trustees, and early on Monday morning, January 29th, communicated it to the other. The trustees on that day instructed their counsel to issue execution, which was done. On Wednesday, January 31st, the general creditors filed a petition in bankruptcy, under which A. Benton & Bro. were adjudicated bankrupts on the twenty-seventh of March, 1877, upon the ground that they had procured the execution on the $20,000 judgment in favor of C. P. Waller and Mrs. Benton to be issued.

The property levied on was sold under an order entered in the present equity proceedings, and the proceeds deposited in the registry of the court. The master reported that under the above facts he was of opinion that both executions had been procured, but that even if the syndicate execution had not been procured the plaintiffs therein had not established any equitable ground to entitle them to

priority, and the first execution being more than sufficient to exhaust the entire fund, and being void as against the assignees in bankruptcy on the ground of procuration, the assignees in bankruptcy should be awarded the fund. Exceptions to this report were filed by both the first and second execution creditors.

*B. F. Fisher* and *Wayne MacVeagh,* for C. P. Waller and Mrs. Benton.

*A. M. Burton,* for trustees of syndicate judgment.

*Frank P. Prichard* and *G. C. Purves,* for assignees in bankruptcy.

BUTLER, D. J. The master's statement of facts, and the report generally, are satisfactory, down to the point where the cross-bill of *Von Utassy* v. *Galvin* is reached and considered. We are unable, however, to adopt his conclusions respecting this bill. The plaintiffs claim that their execution against A. Benton & Brother should have precedence over that of Mrs. Benton and Judge Waller, on the ground that the note and warrant in favor of Benton and Waller, as also the execution issued in pursuance of it, was a fraud on the plaintiffs' rights. We think this claim is well founded. The object of the syndicate agreement,—signed by the parties to this bill,—was to furnish A. Benton & Brother means to prosecute their business, for the mutual benefit of the creditors uniting in the agreement. The firm was unable to meet its obligations, and they were the principal creditors. Its trade was dull and its property unavailable. A sale at the time would have resulted in great sacrifice. The money proposed to be furnished by these creditors, it was hoped and believed, would enable the debtors to prosecute their business successfully, or at least to retain their property until more prosperous times. As security for the money to be furnished, the creditors were to have a judgment, payable in 10 days after default by the debtors to meet their paper. While the plaintiffs entered into the arrangement and advanced their money with no other consideration or prospect of advantage, than that already stated, the representatives of Mrs. Benton and Judge Waller secretly obtained a note and warrant of attorney for $20,000, by means of which they could sweep away not only the property owned by the debtors at the date of the agreement, and thus defeat its purpose, but also such additional property as might be acquired by the money obtained from the plaintiffs. That this was a plain violation of the understanding of the parties,—subversive of the only object contemplated by the agreement,—does not seem to admit of doubt. Certainly not one of the plaintiffs would have advanced a dollar had he been informed of the secret advantage obtained by Mrs.

Benton and Judge Waller. As matters stood at the outset the creditors were on an equality. The firm being insolvent, any proceeding to secure preference would have placed its property in bankruptcy, where all would have shared equally. It cannot be supposed that the plaintiffs would not only risk this advantage, by tying their hands, but also would transfer to the debtors a considerable amount of their own property to be swept away by Mrs. Benton and Judge Waller, at pleasure. That it was fully and distinctly understood that the debtors were to be kept clear of all other judgments than that given to the syndicate creditors appears as plainly from the conduct of the parties at the time the agreement was entered into, and subsequently, as it does from the motives of the parties and the object of the transaction, just referred to. The master finds that—

"Promises were made by the debtor immediately before and about the time of the execution of the agreement, to certain of the parties thereto, that no other judgment should be given; and that notice should be given if judgments were likely to be obtained; and that the judgment about to be given to the syndicate should be a lien on the personal property as well as upon the real estate."

It is unimportant that Mrs. Benton and Judge Waller were not present (as the master finds) when these promises were obtained. They were procured for the joint benefit of all the syndicate creditors,—who were acting together for their mutual protection,—each one to a certain extent representing his fellows in the transaction. These promises are here referred to, however, as one of the surrounding circumstances, simply, in the light of which the written agreement is to be read. Again, when Charles Benton was asked to sign the note and warrant in favor of Mrs. Benton and Judge Waller, he at first declined, on the ground that it would be *wrong* to do so; and only consented subsequently, at the instance of his brother, who agreed that it might be done, *"provided Mrs. Benton* [his wife] *was included."* When the syndicate creditors discovered that other judgments, to a small amount, existed against the debtors, they immediately complained of it as a *violation of the agreement;* and no one connected with the transaction suggested that this was not a just cause of complaint. The representatives of Mrs. Benton and of Judge Waller were present when the complaint was made, and plainly acknowledged its justice. The plaintiffs were not then aware of the note and warrant given for $20,000. Regarding themselves as unjustly dealt with, however, because of the existence of the small judgments, and of the debtors' failure to furnish a statement, as promised, respecting the

real estate, they had resolved to issue execution. They were induced, however, by the debtors, and the representatives of Mrs. Benton and Judge Waller, to withhold for 48 hours, under a promise that the small judgments would be paid, and a statement furnished, in the mean time. Instead of making any serious effort to redeem this promise, (and it is quite manifest that none was intended to be made,) the debtors and the representatives of Mrs. Benton and Judge Waller immediately had judgment entered on the $20,000 note, and an execution issued, covering more than twice the value of all the property the debtors owned. Here, again, was an attempt to secure advantage by means of bad faith and imposition. The subject need not be pursued. Sufficient has been said to justify the conclusion that the Benton-Waller execution must be postponed. It seems proper to say in this connection, that Judge Waller, who resides at a distance, had very little personal connection with the transaction involved, and probably no personal knowledge of the particular features which have given rise to this controversy. The general scope of his attorney's authority covered all matters involved, and he must bear the consequences. The authority of the attorney has not been questioned by him; and no one else can question it.

We do not see anything in the evidence to justify a belief that the execution on the syndicate judgment was procured by the debtors, in violation of the bankrupt law. It is true that an agreement was entered into when the judgment was confessed, that these creditors should have a preference over all others, of execution against the personalty of the debtors; and be notified by the debtors when danger threatened from other sources. As we have seen, however, the debtors not only failed to perform this agreement, but sought to defeat these creditors by a preference of the Benton-Waller judgment, whose amount exceeds twice the value of all their property. The subsequent notice was unimportant. The debtors then supposed the plaintiffs could get nothing. It was notice that an execution would do no good, and was as well calculated to induce them to desist, as to proceed. They could get nothing except by defeating the object of the debtors. It would be a perversion of language to say that this execution was procured to give the plaintiffs a preference. The master's finding as respects the rights of the syndicate creditors, between themselves, is adopted.

McKENNAN, C. J., concurred.